IN THE UNITED STATES DISTRICT COURT FOR
THE DISTRICT OF MARYLAND, NORTHERN DIVISION

MARGARET TEMPLETON,

    Plaintiff,

       v.

                    CIVIL NO.: WDQ-09-3280

FIRST TENNESSEE BANK, N.A.,
*et al.*,

    Defendants.

\*　　\*　　\*　　\*　　\*　　\*　　\*　　\*　　\*　　\*　　\*　　\*　　\*

MEMORANDUM OPINION

Margaret Templeton sued First Tennessee Bank, N.A. ("First
Tennessee")[1] and MetLife Bank, N.A., d/b/a MetLife Home Loans
("MetLife") for employment discrimination and related torts. On
June 3, 2010, the Court granted First Tennessee's motion to
dismiss and MetLife's motion for judgment on the pleadings.
Templeton appealed. On April 22, 2011, the Fourth Circuit
affirmed in part, vacated in part, and remanded for further
proceedings. Pending is the Defendants' motion for summary
judgment on the remaining claims. For the following reasons,
the motion will be denied.

---

[1] First Tennessee is a subsidiary of First Horizon National
Corporation ("First Horizon"). Compl. ¶ 7.

I. Background[2]

A. Templeton's Employment History (1986 to 2006)

Between 1986 and 2006, Templeton worked intermittently as a loan officer[3] for First Horizon Home Loans Corporation ("First Horizon Home Loans")[4] and its predecessors in various Maryland locations.[5] *See* Templeton Dep. 46:18-19; 58:5-8. *See generally id.* 60-62. Until 1992, Templeton's immediate supervisor was branch manager Bill Gellatly. Gellatly Aff. ¶ 1. After

---

[2] In reviewing a motion for summary judgment, the nonmovant's evidence "is to be believed, and all justifiable inferences are to be drawn in h[er] favor." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986).

[3] Loan officers (also known as "relationship managers") originate residential mortgages. Templeton Dep. 46:19-20; EEOC Charge Information Questionnaire at 2.

[4] First Tennessee's national mortgage division from August 31, 1995 to August 31, 2008. Bacon Decl. ¶ 4. ("Bacon" is Linda Bacon, First Tennessee's HR Compliance and Risk Director. *Id.* ¶ 2.)

[5] Between 1986 and 1993, Templeton worked for Equitable Bank's E.B. Mortgage Corporation ("E.B. Mortgage") in Arnold, Maryland. Templeton Dep. 60:6-14. At some time in the late 1980s or early 1990s, E.B. Mortgage was purchased by Maryland National Bank. *See* ECF No. 89-1 at 2 n.1; Koenig Dep. 12:5-7. ("Koenig" is Geraldine Koenig, who was in charge of "operations" at all relevant times. Koenig Dep. 15:13-17.) According to Bacon, First Tennessee acquired MNC Mortgage--which was "part of Maryland National Corporation"--in October 1993. Bacon Decl. ¶ 3. According to Templeton, First Tennessee acquired "Maryland National Mortgage Corporation" and changed its name to MNC Mortgage, which later became known as First Horizon. ECF No. 89-1 at 2 n.1. Despite these discrepancies, the parties agree that Templeton worked for entities that were related--through acquisition or otherwise--to First Tennessee, and generally known as First Horizon. ECF No. 66-1 at 3 & n.1; ECF No. 89-1 at 2.

Gellatly resigned, MNC Mortgage Executive Vice President Theodore ("Chip") Reichhart, Jr. tentatively chose Robert Cameron as Gellatly's replacement. *See generally* Reichhart Dep. 22; *id.* 32:11-16. Templeton believed that Cameron's poor business reputation "preceded him," and she shared these concerns with Reichhart. Templeton Dep. 63:7-19. Reichhart agreed to perform more research and background checks on Cameron. Reichhart Dep. 33:7-14. After Cameron "checked out extremely well," Reichhart offered him the job. *Id.* 34:8-12. Templeton resigned three weeks later. *Id.* 28:17-20.

For the next four years, Templeton worked for Maryland Home Mortgage and Atlantic Home Mortgage. Templeton Dep. 61:19 to 62:10. In July 1997, Templeton sought to return to work for First Horizon as a loan officer in the Severna Park, Maryland office. *Id.* 62:11-15. Cameron notified Reichhart[6] of Templeton's interest in being rehired. Reichhart Dep. 36:24-25. Reichhart "strongly recommended" that Cameron not rehire Templeton because of "issues on the operational side," such as lack of attention to detail. *Id.* 37:1-2, 16-22.[7] Cameron

---

[6] Reichhart had been promoted to divisional president in 1995, and was involved in the hiring of all loan officers within the division when Templeton sought reemployment. Reichhart Dep. 22:5-17; 36:16-24.

[7] Reichhart was made aware of these issues during "several" conversations with Koenig before Templeton's return to First Horizon. Reichhart Dep. 37:22-25; 38:10-17. Koenig--who

3

persuaded Reichhart to change his mind, and Templeton was rehired. *Id.* 37:9-10.

Upon returning to the Severna Park office, Templeton worked principally with self-employed customers. Reichhart Dep. 48:19-20. Self-employed clients require more involvement by loan officers, who must collect sufficient documentation of profits and losses from the customer to facilitate loan processing. *Id.* 48:1-7; Koenig Dep. 17-18. According to Reichhart, Templeton "probably" "had a weakness" in collecting this information from her clients. Reichhart Dep. 48:7-11.[8] Further, Templeton met with Reichhart every six to 12 months to complain about Cameron and that she was overburdened at work. *See generally* Reichhart Dep. 43-46. Despite these reported issues, Templeton was consistently one of First Horizon's top producers[9] and "the quality of the business [she produced]" was "very good to excellent." *Id.* 40:12-14; 47:2-15. Peter O'Donnell, who was a loan officer between 1997 and 2005, described his experience

---

"common[ly]" discussed problems with loan officers' performance with Reichhart--described Templeton as a "challenge." *Id.* 39:5-8; Koenig Dep. 12:20-21.

[8] Koenig similarly testified that she and Cameron discussed problems arising from Templeton's inadequate documentation and "aggressive[]" efforts to "get the loans through the system." Koenig Dep. 17:2-6, 14-25.

[9] Between 2001 and 2005, Templeton produced over $30 million in mortgages. Templeton Aff. ¶ 4. As of September 30, 2005, Templeton was ranked 134th in sales, out of First Horizon's 1700 loan officers nationwide. Templeton Dep. 316:14-16.

4

working with Templeton as "good." O'Donnell Dep. 19:3-5.

B. The Alleged Sexual Harassment

On October 17, 2005, Templeton called Koenig to report sexual harassment by Cameron. Templeton Aff. ¶ 9. Specifically, Templeton told Koenig that, during a cab ride home from a business cocktail party the previous Friday, Cameron had kissed her on the lips after she repeatedly told him not to. *See id.* ¶¶ 6-8. According to Templeton, Koenig replied: "You know, Margaret, if you do anything about this, you will have to be transferred or leave the company." *Id.* ¶ 9.[10] Templeton called Koenig again on December 19, 2005 to report that, during a work-sponsored Christmas luncheon three days earlier, Cameron had behaved inappropriately toward Templeton's processor Susan Grapes. Templeton Aff. ¶ 15.[11] Koenig responded that Cameron was "one of Chip's boys," and reiterated that Templeton would "have to be transferred or leave the company" if she pursued her

---

[10] According to Koenig, she told Templeton to "talk to someone about that" because Koenig "couldn't do anything about it." Koenig Dep. 23:4-7.

[11] The parties offer different accounts of the December 2005 incident. According to Templeton, Grapes called her at home the day after the party and said that Cameron had pulled her toward him, held her as she struggled, and kissed her on the mouth. Templeton Aff. ¶ 13. Grapes was "crying and was pretty hysterical." *Id.* According to Reichhart, Templeton told him only that Cameron had made an inappropriate comment to Grapes while she was wearing a short skirt and leaning over the bar. Reichhart Dep. 57:3-18.

complaint. *Id.*[12]

On January 11, 2006, Templeton met with Reichhart to report both incidents. Templeton Dep. 26:15-19; Templeton Aff. ¶¶ 18-19. Reichhart "chastised" her for being in a cab with Cameron, but admitted that he would "have to do something about Rob's behavior." Templeton Aff. ¶ 19. After speaking with Cameron,[13] Grapes,[14] and Employee Services Relations Manager Brenda Mengle, Reichhart informed Cameron that he was not allowed to attend any functions--business or social--with Templeton, or have any conversations in his office with the doors closed unless supervised by another employee. *See* Reichhart Dep. 57-65. Reichhart also told Cameron that another incident could result in his termination. *Id.* 62:5-6. Reichhart met with Mengle again; she told him that he had done "everything [he] had to do," and she would "take care of the file." *Id.* 63:5-8, 19-21.

After Cameron was reprimanded for the alleged sexual

---

[12] Koenig explained that she had described Cameron as "one of Chip's boys" because Reichhart had brought Cameron and others into the business and trained them. Koenig Dep. 58:3-7. Reichhart testified that he considers Cameron a "personal friend," with whom he socializes outside of work. Reichhart Dep. 95:17-24.

[13] Cameron admitted he had "giv[en]" Templeton a "farewell kiss" but "didn't believe there was anything to it." Reichhart Dep. 57:23 to 58:2.

[14] Grapes purportedly told Reichhart that there was "no need" for him to further investigate the incident because she "didn't have an issue." Reichhart Dep. 64:23-25.

harassment, Templeton experienced a series of miscellaneous annoyances. Cameron refused to acknowledge or speak to her. Templeton Aff. ¶ 29. In June 2006, her phone and computer were unplugged, and she discovered a "fresh large puddle" of liquid on her office chair's seat. *Id.* ¶¶ 38-39, 41; Templeton Answer to Interrog. No. 9. On June 30, 2006, Templeton resigned, effective July 1, 2006. Compl., Ex. 1. Her letter of resignation to Mengle explained:

> As you are well aware, I have had some painful years in our Severna Park Branch. I have tried for years through many paths to work around these troubles-- which included sexual harassment by my immediate supervisor as well as retaliation for my having told his superior of his discriminatory conduct. That said, over the past year it has become increasingly clear that I can no longer deal with the toxic environment created by the local management and allowed to fester by higher management. Self preservation dictates that I now move on.

Compl., Ex. 1. Reichhart did not see Templeton's resignation letter, and "[does not] recall" whether he was told the reason she resigned. Reichhart Dep. 66:25 to 67:11.

C. The Alleged Retaliation

1. First Tennessee: the 2008 Failure to Rehire

From July 2007 to September 2008,[15] Templeton worked as a loan officer for Countrywide Home Loans, Inc. ("Countrywide") in

---

[15] From July 2006 to January 2007, Templeton worked as a branch manager for International Bank Shares Mortgage Group ("IBMG"); from April 2007 to June 2007, she worked as a loan officer for First Citizens Bank. *See generally* Templeton Dep. 53:1-12; 54:9-17; 56:6-9.

the company's Columbia and Severna Park offices. Templeton Dep. 43:11-16; 44:3-12, 17-19. Sometime in April or May 2008, Templeton called O'Donnell--who was then the branch manager at the Severna Park office--to ask whether he would consider granting a "good" loan that she had originated but Countrywide had denied. *Id.* 71:11-22; 72:7-18; O'Donnell Dep. 8:6-18; 41:24 to 42:6. O'Donnell referred Templeton to O'Donnell's Sales Manager Mark Seifert, who succeeded in closing the loan. Templeton Dep. 73:20 to 74:3; O'Donnell Dep. 42:9-15.

"At some" time in this process, O'Donnell and Seifert discussed the possibility of rehiring Templeton. O'Donnell Dep. 42:16-18; 43:13-24.[16] They specifically discussed Templeton's history of "good" production, but acknowledged their "concern" that some of the processors might object to her return. *Id.* 46:10-21. Neither man knew "what kind of volume" Templeton was "doing" at the time, and they agreed they "would have to ask." *Id.* 46:1-5.

On July 9 or 10, 2008, O'Donnell called Templeton to discuss the idea of her returning to work at the Severna Park office. Templeton Dep. 70:8 to 71:4.[17] Templeton testified

---

[16] O'Donnell could not recall whether he or Seifert initially suggested hiring Templeton. O'Donnell Dep. 45:5-11.

[17] O'Donnell was "hoping" to bring Templeton back to First Horizon to have a "new hire on the books." O'Donnell Dep. 53:24 to 54:8.

about their conversation:

> I picked up the phone, I said hello. And Pete said, Hey Templeton, I understand that you're not really happy at Countrywide. And I said, That's correct. And we had a little conversation about that.
>
> And he said, Well, you know, Rob's gone, I'm now the manager, why don't you come back and work with me? He said, I want to be aggressive, do more in Annapolis. And he kind of laid out what he wanted to do. And he said we would be really good together. And I said, Yes, Peter, we would be. And I have a lot of respect for Pete O'Donnell. And so I thought it was a really good idea. And I always had a great deal of respect for corporate First Horizon, because I thought it was a good company.
>
> And so, therefore, I said yes, that I would entertain that idea. We talked a little bit about would you put some stuff[18] together for me. I said, yes, I would do that.

Templeton Dep. 83:2-20.

During the same conversation, Templeton asked O'Donnell about the "elephant in the room" (i.e., Reichhart). Templeton Dep. 83:22 to 84:3; 86:4-5. O'Donnell stated that he had "little influence" on Reichhart, who was a "very high producer," but told Templeton he would speak to other managers about her potential rehiring and call her afterwards. *Id*. 84:5 to 85:1. Templeton states that O'Donnell "was a high [p]roducer [who] usually got what he wanted in hiring loan officers"; he had hired two--Donna Case and Mike Archer--in 2004 and 2005.

---

[18] O'Donnell testified he and Templeton "talked about getting . . . some figures or potentially W-2s or pay stubs together." O'Donnell Dep. 50:11-13. O'Donnell recalled little else about the conversation, such as who initiated it and whether it was by telephone or email. *Id*. 47:16-21; 48:22-24.

Templeton Aff. ¶ 61.  However, Templeton understood her return
to First Horizon was not "finalized" and would require
Reichhart's approval.  Templeton Dep. 85:5-11; 157:7-8.

After her conversation with O'Donnell, Templeton saw an
online advertisement by First Horizon for the position of loan
officer in Maryland.  *See generally* Templeton Dep. 102-05.

On July 22, 2008, Templeton emailed O'Donnell a list of her
goals, skills, and references.  Templeton Dep., Ex. 5.  In the
email, Templeton explained that she "ha[d] no idea what kind of
numbers your people are pulling in w/this environment," but
would "do what [she] c[ould] to meet/exceed" First Horizon's
expectations.  *Id.*  Koenig testified that it is "normal
practice" for a manager to review a potential loan officer's W-
2's and pay stubs to "identify what volume of business they
would do."  Koenig Dep. 27:23 to 28:1.  According to Templeton,
O'Donnell did not request--and she did not provide--such
documentation.  Templeton Dep. 109:7-16; Templeton Aff. ¶ 63.[19]
O'Donnell stated that he asked Templeton for this information,
and she responded that her volume "[was] not what [he was]
asking for."  O'Donnell Dep. 78:4-22; *see id.* 114:1-10.

---

[19] Templeton characterizes the completion of loan officer
employment applications as a "formality" in the mortgage banking
industry, particularly when the company knows the applicant.
Templeton Aff. ¶ 53.  Typically, "the paperwork is not completed
until after the offer has been extended . . . and accepted."
*Id.*  First Horizon has hired and rehired other employees without
requesting pay stubs or income information.  *Id.* ¶ 67.

O'Donnell discussed Templeton's potential rehiring with managers Koenig and Al Ingraham,[20] and--"later down the road"-- with Reichhart. O'Donnell Dep. 50:11-22. Ingraham agreed they should "look into" hiring Templeton, and O'Donnell agreed he would have to "get more specifics" from her before a decision could be made. *Id.* 53:9-19. Ingraham noted that some processors and underwriters "might" take issue with Templeton's rehiring. *Id.* 54:24 to 55:7; 58:2-7. Koenig similarly acknowledged that Templeton had "good volume," but wanted processors' and underwriters' approval. *Id.* 58:8-16; 73:2 to 74:24.[21] Reichhart expressed "concern" that Templeton had "los[t] [her] capacity" to deal with First Horizon agents, and noted that Templeton did not appear to have the requisite production numbers. *Id.* 63:12-25; 64:22-24. Reichhart told O'Donnell that he would not "sign off" on rehiring Templeton, because "it wasn't a good time for [O'Donnell] to do this and the qualifications weren't there." *Id.* 65:11-15; *see id.* 75:7-25.

---

[20] *See* Templeton Dep. 84:9-12; Templeton Answer to Interrog. No. 1. The correct spelling of Ingraham's name is unclear: the record contains references to "Ingrham," "Ingraham," and "Ingram." *See id.* ("Ingrham"); O'Donnell Dep. 50:16 ("Ingraham"); ECF No. 66-1 at 9 ("Ingram"). Because "Ingraham" appears to incorporate the alternatives, the Court will use this spelling for purposes of this memorandum opinion.

[21] According to Templeton, processors and underwriters "normally are not consulted in the hiring of a [l]oan [o]fficer." Templeton Aff. ¶ 68.

At about 7:30 p.m. on July 29 or 31, 2008,[22] O'Donnell called Templeton to inform her that, although Koenig and Ingraham had approved her rehiring, Reichhart had "'stopped the rehiring process'" because Templeton "'had issues with management.'"  Templeton Dep. 109:20 to 110:1; 110:20 to 111:17; 112:14 to 113:4 (*quoting* Compl. ¶ 19); *see also* Templeton Aff. ¶ 69.[23]  O'Donnell told Templeton that MetLife would be "taking over" in September, and to "hang in there."  Templeton Dep. 113:7-9.  O'Donnell apologized, and stated that he "apparently didn't have the influence" he thought he had.  *Id*. 114:3-4.[24]

    2. MetLife[25]: the 2009 Failure to Rehire

    From October 2008 to June 2009, Templeton worked as a loan

_____

[22] *See* Templeton Dep. 111:4-6 (affirming that O'Donnell called her on "the Tuesday or Thursday after July 22[]").

[23] In her answers to interrogatories, Templeton stated that Reichhart had told O'Donnell--and O'Donnell told her--she would not be rehired because she had "management issues."  Templeton Answer to Interrog. No. 16.  Contrary to the Defendants' assertion, ECF No. 66-1 at 10 n.14, neither version of Reichhart's alleged statement is hearsay.  *See* Fed. R. Evid. 801(d)(2)(D) (statements not hearsay if offered against an opposing party and made by the opposing party's agent or employee "on a matter within the scope of that relationship and while it existed"); 805 ("Hearsay within hearsay is not excluded by the rule against hearsay if each part of the combined statements conforms with an exception to the rule.").

[24] O'Donnell could not recall when he relayed the decision to Templeton; whether it was by telephone or email; and what was said during the conversation.  O'Donnell Dep. 79:12 to 80:13; 105:8 to 106:7.

[25] MetLife acquired First Horizon Home Loans in September 2008.  Bacon Decl. ¶ 6.

officer at National City Bank ("National City") in Odenton, Maryland.[26] Templeton Dep. 33:3-11; Templeton Answer to Interrog. No. 13. Her manager was Michael Taylor. Taylor Dep. 20:10-13. When Templeton began working for National City, there were about 20 loan officers in the Odenton office. Templeton Dep. 32:18-21.

In October 2008, PNC Bank ("PNC") announced its acquisition of National City. Taylor Dep. 14:16-20. By the time Templeton joined National City's Odenton office in early 2009--around the time the PNC acquisition became effective--the "majority" of loan officers there had "picked up and [gone] to First Horizon." Templeton Dep. 32:18-22, 34:5-13; Taylor Dep. 14:10-11.[27] On May 5, 2009, PNC released its new business model, which was disfavored among remaining National City employees. *See* Taylor Dep. 27:10-14. Taylor began exploring employment opportunities at several companies, including MetLife. *Id.* 28:8-15; 31:7-10.[28]

Between May and August 2009, Taylor spoke with "a lot of

---

[26] Templeton was hired to work in Annapolis, Maryland, but the branch closed soon after she arrived. Templeton Dep. 33:9-11.

[27] According to Templeton, none of the officers who left National City for First Horizon had actively sought employment there. Templeton Dep. 30:2-4.

[28] Taylor had already met with MetLife leadership--including Reichhart, who was then the regional manager--in late August or September 2008. *See generally* Taylor Dep. 29:12 to 31:6. Taylor "wasn't enthralled" with MetLife's offer, and the formal talks ended. *Id.* 31:3-6.

different people" at MetLife about hiring National City/PNC employees. Taylor Dep. 32:2-5; *see id.* 41:20 to 42:3. Templeton came up in these conversations, because "people" wanted to know who was still working at National City's Odenton branch; however, she "wasn't a main subject of conversation." *Id.* 42:16-20; 43:4-9. "Somebody" at MetLife remarked to Taylor that Templeton "was a bit of a pain in the butt" and "high maintenance." *Id.* 45:12-15. No MetLife employee stated that he did not want Templeton to come to MetLife, *id.* 47:15 to 48:8, and Templeton did not personally speak with anyone about employment at MetLife in June 2009, Templeton Dep. 29:14-16. At about the same time, Templeton saw an online job posting by First Horizon for the position of loan officer in Severna Park. *See generally id.* 30:14 to 32:9.

Templeton is not personally aware of any First National employee who was hired by MetLife as a loan officer in June 2009. Templeton Dep. 36:6-9. Templeton alleges that, sometime during that month, Taylor told her someone at MetLife had "refused" to hire her. *Id.* 29:3-13.[29]

D. Procedural History

On January 23, 2009, Templeton filed a complaint against MetLife with the Equal Employment Opportunity Commission (the

---

[29] Templeton testified that Taylor told her the employee had stated MetLife would not "welcome" her. *See* Templeton Dep. 69:12-14; Templeton Answer to Interrog. No. 17.

"EEOC"). Templeton Dep., Ex. 14. On February 4, 2009, she amended that complaint to add First Tennessee as a respondent. *Id.*, Ex. 15. On September 2, 2009, the EEOC issued a right to sue letter. Compl. ¶ 3; ECF No. 22, Ex. 2.

On October 30, 2009, Templeton sued the Defendants in the Circuit Court for Anne Arundel County, Maryland. ECF No. 3.[30] On December 10, 2009, with First Tennessee's consent, MetLife removed the action to this Court. ECF Nos. 1, 2. On January 5, 2010, First Tennessee moved to dismiss for failure to state a claim, ECF No. 17, and MetLife answered the complaint, ECF No. 19. On January 8, 2010, MetLife moved for judgment on the pleadings. ECF No. 20. Templeton opposed the motions, ECF Nos. 22, 23, and the Defendants replied, ECF Nos. 24, 25.

On June 3, 2010, the Court granted the Defendants' motions and closed the case. ECF Nos. 27, 28. The Court determined, *inter alia*, that MetLife's alleged June 2009 comments (that MetLife "would not welcome [Templeton's]" transfer from National City) was not "adverse employment action," and First Horizon's 2008 decision not to rehire Templeton was not causally connected

---

[30] The complaint alleged four causes of action:
   (1) Retaliation, in violation of Title 20 of the State Government Article of the Maryland Code ("Title 20"), Md. Code Ann., State Gov't §§ 20-601, *et seq.* (Count One);
   (2) Retaliation, in violation of Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. §§ 2000e, *et seq.* (Count Two);
   (3) Negligent supervision and retention (Count Three); and
   (4) Intentional infliction of emotional distress (Count Four).

15

to her reports of sexual harassment in 2006. ECF No. 27 at 10-12. Templeton appealed the dismissal of her retaliation claims. ECF No. 29. Templeton did not appeal the dismissal of her state law claims for negligent supervision and retention and intentional infliction of emotional distress. *Templeton v. First Tenn. Bank, N.A.*, 424 F. App'x 249, 250 n.1 (4th Cir. 2011) (per curiam).

On April 22, 2011, the U.S. Court of Appeals for the Fourth Circuit affirmed in part, vacated in part, and remanded for further proceedings. ECF No. 32. The Fourth Circuit held that the Court had erred in dismissing Templeton's retaliation claims on the basis that too much time had elapsed between her harassment complaint and the Defendants' refusal to rehire her. *Templeton v. First Tenn. Bank, N.A.*, 424 F. App'x 249, 251 (4th Cir. 2011) (per curiam). Specifically, "[b]ecause Templeton resigned her employment shortly after she complained of harassment, Templeton was retaliated against, if at all, upon the employer's first opportunity to do so, *i.e.*, when Templeton expressed her interest in being rehired approximately two years after her resignation." *Id.* (*citing Price v. Thompson*, 380 F.3d 209, 213 (4th Cir. 2004) (assuming, without deciding, that "in the failure-to-hire context, the employer's knowledge coupled with an adverse action taken at the first opportunity satisfies the causal connection element of the prima facie case")).

The Fourth Circuit's mandate issued on May 16, 2011. ECF No. 33. On May 17, 2011, the Court ordered the case reopened. ECF No. 35; *see* docket. On June 6, 2011, First Tennessee answered the complaint. ECF No. 38. On December 15, 2011, the Defendants moved for summary judgment. ECF No. 66. On January 10, 2012, the Court granted Templeton's counsel's motion to withdraw, and stayed the proceedings 60 days to allow Templeton to retain new counsel. ECF No. 78.[31] On April 23, 2012, Templeton timely opposed the motion for summary judgment. ECF No. 89; *see* ECF No. 88. On June 6, 2012, the Defendants timely replied. ECF No. 96; *see* ECF No. 95.

II. Analysis

   A. Legal Standard

   Under Rule 56(a), summary judgment "shall [be] grant[ed] . . . if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).[32] In considering the motion, "the judge's function is not . . . to weigh the evidence and determine the truth of the matter but to determine whether

---

[31] It appears from the docket that the stay was never lifted. The Court will direct the Clerk to lift the stay.

[32] Rule 56(a), which "carries forward the summary-judgment standard expressed in former subdivision (c)," changed "genuine 'issue' [to] genuine 'dispute,'" and restored the word "'shall' . . . to express the direction to grant summary judgment." Fed. R. Civ. P. 56 advisory committee's note.

there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986). A dispute about a material fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id*. at 248.

The Court must "view the evidence in the light most favorable to . . . the nonmovant, and draw all reasonable inferences in [his] favor," *Dennis v. Columbia Colleton Med. Ctr., Inc.*, 290 F.3d 639, 645 (4th Cir. 2002), but the Court must abide by the "affirmative obligation of the trial judge to prevent factually unsupported claims and defenses from proceeding to trial," *Bouchat v. Balt. Ravens Football Club, Inc.*, 346 F.3d 514, 526 (4th Cir. 2003) (citation and internal quotation marks omitted). A party opposing summary judgment "may not rest upon the mere allegations or denials of [his] pleadings, but rather must set forth specific facts showing that there is a genuine issue for trial." *Id*. at 525.

B. The Defendants' Motion

1. Timeliness Issues

The Defendants argue that Templeton's Title 20 retaliation claim is time-barred, because she "has not come forward with any evidence showing if and when her EEOC charge was forwarded to the [Maryland Commission on Human Relations, or "MCHR"]." Templeton contends that, in denying the Defendants' motion to dismiss on this basis, "'the Court assume[d] that her EEOC

charges were forwarded to and received by the MCHR within 48 hours of their receipt,'" and the Defendants "have not shown otherwise." ECF No. 89-1 at 26 n.22 (*quoting* ECF No. 27 at 9).

A complainant may bring a civil action for employment discrimination under Title 20 if (1) she filed a timely administrative charge against the defendant under federal, State, or local law; (2) at least 180 days have elapsed since the administrative charge was filed; *and* (3) the action is filed within two years after the alleged discrimination occurred. Md. Code Ann., State Gov't § 20-1013(a). If filed with the MCHR, the administrative complaint must be filed within six months after the alleged "discriminatory act" occurred. *Id.* § 20-1004(c)(1).[33] If filed with the EEOC, the complaint must be filed "within [180] days after the alleged unlawful employment practice occurred," *or* within 300 days if the complainant "initially instituted proceedings with a State or local agency with authority to grant or seek relief" from unlawful employment practices. 42 U.S.C. § 2000e-5(e)(1). Under the MCHR and EEOC's worksharing agreement, a discrimination complaint filed with the EEOC and forwarded to the MCHR within 300 days of the

---

[33] "A complaint filed with a federal . . . commission within [six] months after the date on which the alleged discriminatory act occurred shall be deemed to have complied with this subsection." Md. Code Ann., State Gov't § 20-1004(c)(2).

alleged violation is timely.[34]

Templeton has alleged that the Defendants refused to hire her in July 2008 and June 2009 in retaliation for her having accused Cameron of sexual harassment in 2005. Compl. ¶¶ 18-21. With respect to her July 2008 allegations, Templeton testified that O'Donnell called her at about 7:30 p.m. on July 29 or 31, 2008, to inform her that Reichhart had "'stopped the rehiring process'" because Templeton "'had issues with management.'" *See* Templeton Dep. 109:20 to 110:1; 110:20 to 111:17; 112:14 to 113:4 (*quoting* Compl. ¶ 19); *see also* Templeton Aff. ¶ 69. On January 23, 2009, Templeton filed a charge of discrimination against MetLife for the alleged July 2008 retaliation. Templeton Dep., Ex. 14. On January 26, 2009, counsel for MetLife notified Templeton by letter that, because MetLife did not acquire First Horizon Home Loans until September 1, 2008, First Tennessee--not MetLife---was the responsible party. Compl. ¶ 2 n.1. "Subsequently," counsel for First Tennessee called Templeton to inform her that it disputed its

---

[34] *EEOC v. Techalloy Md., Inc.*, 894 F.2d 676, 678 (4th Cir. 1990); *Francis v. Bd. of Sch. Comm'rs of Balt. City*, 32 F. Supp. 2d 316, 321 (D. Md. 1999).

Under the worksharing agreement, charges received by the EEOC are to be forwarded to MCHR within 48 hours of their receipt. *Techalloy*, 894 F.2d at 678. The Fourth Circuit has "declined to decide whether the charge should be considered as filed on the date the EEOC received it or on the date it was received by the MCHR." *Bennett v. St. Mary's Cnty. Sheriff's Dep't*, 229 F.3d 1141 (Table), 2000 WL 1144600, at *1 (Aug. 14, 2000) (*quoting Techalloy*, 894 F.2d at 678 n.4).

responsibility. *Id.* On February 4, 2009, Templeton filed an amended charge of discrimination against First Tennessee. Templeton Dep., Ex. 15.

As discussed above, a complainant may bring a civil action for employment discrimination under Title 20 if, *inter alia*, she filed a timely administrative charge against the defendant under federal law. Md. Code Ann., State Gov't § 20-1013(a). Under 42 U.S.C. § 2000e-5(e)(1), a Title VII charge must be filed with the EEOC within 180 days "after the alleged unlawful employment practice occurred," *or* with a state or local agency within 300 days of such practice. *Jones v. Calvert Grp., Ltd.*, 551 F.3d 297, 300 (4th Cir. 2009). The charge may be amended to (1) "cure technical defects or omissions, including failure to verify the charge," or (2) "clarify and amplify allegations made therein." 29 C.F.R. § 1601.12(b). "Such amendments[,] and amendments alleging additional acts which constitute unlawful employment practices related to or growing out of the subject matter of the original charge[,] will relate back to the date the charge was first received." *Id.*

As an original charge, Templeton's February 4 charge against First Tennessee would fall outside of Title VII's 180-day window--thus requiring Templeton to show that that the 300-day limitation applies. However, Templeton's February 4 charge against First Tennessee amended her January 23, 2009 charge

against MetLife. *See* Templeton Dep., Exs. 14, 15. The factual

allegations in Templeton's two charges are substantively

identical: that First Horizon retaliated against her when it

failed to rehire her in July 2008. Templeton Dep., Exs. 14-15.

The amended charge differs in that it names First Tennessee as

Templeton's employer: a correction allegedly requested by one of

the Defendants. *See* Compl. ¶ 2 n.1. Because this difference is

purely technical, the amended charge against First Tennessee

relates back to Templeton's initial charge against MetLife.[35]

Even assuming that O'Donnell called Templeton to

communicate First Horizon's decision not to rehire her on the

earlier of the two July dates (i.e., on July 29, 2008), fewer

than 180 days passed between then and January 23, 2009, when the

EEOC received Templeton's initial charge. Templeton Dep., Ex.

14. Because Templeton's February 4 charge relates back to her

---

[35] *Cf., e.g.*, *EEOC v. Randstad*, 685 F.3d 433, 444 (4th Cir. 2012) (finding relation back appropriate under § 1601.12(b) as to amendment that made "no new factual allegations"); *Simms v. Oklahoma ex rel. Dep't of Mental Health & Substance Abuse Servs.*, 165 F.3d 1321, 1326 n.1 (10th Cir. 1999) (characterizing name and address corrections as "technical amendments"); *Eggleston v. Chi. Journeymen Plumbers' Local Union No. 130*, 657 F.2d 890, 906 (7th Cir. 1981) ("Congress could not have intended that a person filing EEOC charges should accurately ascertain, at the risk of later facing dismissal, at the time the charges were made, every separate entity which may have violated Title VII."); *Hile v. Jimmy Johns Highway 55, Golden Valley*, 899 F. Supp. 2d 843, 848 (D. Minn. 2012) (later charge, which "did not change the nature of the alleged discrimination or the locations of the alleged misconduct, but simply corrected the names of the respondents from the franchisor to the Franchises," effected a technical amendment, and thus related back).

22

January 23 charge, both are timely under federal law regardless of whether and when the MCHR received them. *See* 42 U.S.C. § 2000e-5(e)(1); Md. Code Ann., State Gov't § 20-1013(a) (complainant may sue for employment discrimination under Title 20 if she filed a timely administrative charge under federal law). Further, Templeton filed this suit on October 30, 2009: more than 180 days after filing her EEOC charges and within two years after the alleged discrimination occurred. *See* Compl; *see also* Md. Code Ann., State Gov't § 20-1013(a)).[36] Thus, her Title 20 retaliation claim is not time-barred.[37]

2. The Merits

The Defendants argue that First Tennessee is entitled to summary judgment as to Templeton's July 2008 allegations because

---

[36] Under Title 20, a complainant may bring a civil action against the respondent alleging an unlawful employment practice if, in addition to her filing a timely administrative charge, "at least 180 days have elapsed since the filing of the administrative charge or complaint," *and* "the civil action is filed within 2 years after the alleged unlawful employment practice occurred." § 20-1013(a); *see also supra* page 19.

[37] The Defendants further note that, to the extent Templeton alleges retaliation based on incidents prior to April 2008, such a claim is time-barred. ECF No. 66-1 at 13-14. "[A]lleged discriminatory acts [that] occurred more than 300 days prior to the filing of the EEOC charge may not be subsequently challenged in a Title VII suit." *Van Slyke v. Northrop Grumman Corp.*, 115 F. Supp. 2d 587, 592 (D. Md. 2000). In her opposition, Templeton asserts that the Defendants retaliated against her by "failing or refusing to rehire her in 2008-2009 because of her prior complaints of sexual harassment." ECF No. 89-1 at 1; *id.* at 37 (stating that "the thrust of Plaintiff's retaliation claim is that Defendants failed or refused to rehire her in 2008-2009"). Thus, the Defendants' argument is moot.

Templeton "cannot" show (1) a causal connection between her protected activity and First Tennessee's decision to discontinue hiring discussions, or (2) that First Tennessee's proffered, legitimate reasons for failing to rehire her were pretextual. ECF No. 66-1 at 2. The Defendants further argue that MetLife is entitled to summary judgment as to Templeton's June 2009 allegations because there is "absolutely no evidence in the record" that Templeton sought--or was considered for--employment with the company, and thus no evidence that an adverse employment action was taken against her. *Id.* Templeton objects that "a reasonable person could find that the [Defendants] declined to rehire her because of her previous protected activities and that their reasons for not rehiring her were pretextual." ECF No. 89 ¶ 3. Templeton further notes that MetLife "has not provided complete discovery responses on key issues in the case," rendering summary judgment inappropriate. *Id.* ¶ 5.

Title VII prohibits an employer from discriminating against any "applicants for employment . . . because [the employee] has opposed any practice made an unlawful employment practice by [Title VII], or because [the employee] has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing" under Title VII. 42 U.S.C. § 2000e-3(a). Title 20 contains nearly identical

language.  Md. Code Ann., State Gov't § 20-606(f).  Absent

direct evidence of intentional discrimination, retaliation

claims under both statutes are analyzed under the burden-

shifting framework established in *McDonnell Douglas Corp. v.*

*Green*, 411 U.S. 792, 802-07 (1973).  To establish a prima facie

case, the plaintiff must show "(1) engagement in a protected

activity; (2) adverse employment action; and (3) a causal link

between the protected activity and the employment action."[38]

If a plaintiff establishes a prima facie case, the burden

shifts to the employer to articulate a legitimate, nondiscrimi-

natory reason for its actions.  *McDonnell Douglas*, 411 U.S. at

802-03; *Edgewood Mgmt.*, 66 A.3d at 1165-66.  Once the employer

comes forward with such a reason, "the burden reverts to the

plaintiff to establish that the employer's non-discriminatory

rationale is a pretext for intentional discrimination."  *Heiko*

*v. Colombo Sav. Bank, F.S.B.*, 434 F.3d 249, 258 (4th Cir. 2006);

*see Edgewood Mgmt.*, 66 A.3d at 1165-66.  This "final pretext

inquiry merges with the ultimate burden of persuading the court

---

[38] *Coleman v. Md. Ct. of Appeals*, 626 F.3d 187, 190 (4th Cir.
2010); *see Edgewood Mgmt. Corp. v. Jackson*, 66 A.3d 1152, 1165-
66 (Md. Ct. Spec. App. 2013); *id.* at 1165 n.8 ("Federal cases
interpreting Section 2000e-3(a) of Title VII . . . are persua-
sive authority in interpreting Maryland's employment discrimi-
nation laws."); *Chappell v. S. Md. Hosp., Inc.*, 578 A.2d 766,
772 (Md. 1990) (In the absence of legislative intent to the
contrary, we read . . . the state act in harmony with § 2000e-
3(a) of the federal statute, and therefore construe the two
provisions to fulfill the same objectives.").

that the plaintiff has been the victim of intentional discrimination, which at all times remains with the plaintiff." *Merritt v. Old Dominion Freight Line, Inc.*, 601 F.3d 289, 294 (4th Cir. 2010) (internal quotation marks and alteration omitted).

a. The July 2008 Failure to Hire

The Defendants "do[] not dispute" that Templeton's filing of a sexual harassment complaint against Cameron was legally protected activity. ECF No. 66-1 at 7 n.9. And, there can be no question that First Tennessee's July 2008 decision not to rehire Templeton was "adverse action." *Price v. Thompson*, 380 F.3d 209 (4th Cir. 2004). The Defendants argue that Templeton has nevertheless failed to establish a prima facie case, because she has "not adduced any evidence" showing a causal connection between the two events, and she has failed to show that their legitimate reasons for not rehiring her were pretextual. ECF No. 66-1 at 17, 20. Templeton contends that there is "strong" circumstantial evidence of causation, such as Reichhart's relationship with Cameron, and witness testimony contradicts the Defendants' proffered reasons for her nonhiring. ECF No. 89-1 at 31, 33.

i. Causation

To survive summary judgment, a plaintiff alleging retaliation "must have evidence from which a reasonable

26

factfinder could conclude that a causal connection exists between the protected activity and the adverse action." *Dowe v. Total Action Against Poverty in Roanoke Valley*, 145 F.3d 653, 657 (4th Cir. 1998). "[A] causal connection for purposes of demonstrating a prima facie case exists where the employer takes adverse employment action against an employee shortly after learning of the protected activity." *Price v. Thompson*, 380 F.3d 209, 213 (4th Cir. 2004). If the alleged adverse action is not "temporally very close" to the protected activity, the plaintiff must provide "other relevant evidence" to support causation. *Atkins v. Holder*, No. 12-2418, 2013 WL 2996448, at *3 (4th Cir. June 18, 2013). In *Price v. Thompson*, 380 F.3d 209 (4th Cir. 2004), the Fourth Circuit assumed (without deciding) that, in the failure-to-hire context, the employer's knowledge, coupled with an adverse action taken "at the first opportunity," satisfies this element. *Id.* at 213.

The Defendants concede that Reichhart was aware of Templeton's complaints about Cameron. ECF No. 66-1 at 17. Moreover, Templeton's letter of resignation criticized Reichhart by reference to "management['s]" failure to prevent Cameron's harassment and address Cameron's retributory actions for her having reported it. Compl., Ex. 1.[39] Finally, Templeton has

---

[39] Reichhart testified that he did not see Templeton's resignation letter, but "[could not] recall" whether Cameron

submitted evidence that First Tennessee failed to rehire her "at the first opportunity" to do so: when O'Donnell and/or Seifert first instigated the rehiring process in late spring 2008. O'Donnell Dep. 42:16-18; 43:13-24; 45:5-11.[40] Specifically, O'Donnell allegedly called Templeton on July 29 or 31, 2008 to inform her that, although other managers had approved her rehiring, Reichhart had "'stopped the rehiring process'" because of Templeton's "'issues with management.'" Templeton Dep.

---

told him the reason for her resignation. Reichhart Dep. 66:25 to 67:11.

[40] The Defendants insist that the evidence does not show adverse action "at the first opportunity," because Templeton worked for an additional six months after notifying Reichhart of her complaints against Cameron in January 2006. ECF No. 66-1 at 18. The Defendants further argue that this six-month period "plainly precludes the temporal proximity necessary to establish the requisite causal connection between her protected activity and the subsequent failure to hire." *Id.*

Neither argument is persuasive. As the Fourth Circuit has already recognized in this case, Templeton resigned "shortly" after she complained of harassment and, accordingly, was retaliated against (if at all) when she expressed interest in being rehired and was rejected. *Templeton*, 424 F. App'x at 251; *see also Dixon v. Gonzales*, 481 F.3d 324, 335 (6th Cir. 2007) ("[A] mere lapse in time between the protected activity and the adverse employment action does not inevitably foreclose a finding of causality. *This is especially true in the context of a reinstatement case, in which the time lapse between the protected activity and the denial of reinstatement is likely to be lengthier than in a typical employment-discrimination case.*" (emphasis added)); *McGuire v. City of Springfield, Ill.*, 280 F.3d 794, 796 (7th Cir. 2002) (Easterbrook, J.) (characterizing the 10-year delay between protected activity and the adverse employment action as "exceedingly long," but noting that "the *reason* a long wait often implies no causation . . . d[id] not apply" because the employer had no earlier opportunity to retaliate).

109:20 to 110:1; 110:20 to 111:17; 112:14 to 113:4 (*quoting* Compl. ¶ 19); *see also* Templeton Aff. ¶ 69.[41]

Considering the evidence as a whole, a reasonable factfinder could conclude that Templeton was refused reemployment because of her protected activity. Thus, she has succeeded in establishing a prima facie case.

ii. Pretext

Because Templeton has established a prima facie case, the burden shifts to the Defendants to articulate a legitimate, nonretaliatory reason for First Tennessee's decision not to rehire her. *See McDonnell Douglas*, 411 U.S. at 802. The Defendants assert that the decision was based on "operational issues" during Templeton's previous periods of employment with the company, and Templeton's insufficient volume of business at the time she sought rehire. *See, e.g.*, Reichhart Dep. 37:1-2, 16-22; 63:12-25; 64:22-24; 65:11-15; 75:7-25; Koenig Dep. 12:20-

---

[41] O'Donnell has not directly refuted Templeton's account; he remembers almost nothing about the relevant conversation. O'Donnell Dep. 79:12 to 80:13; 105:8 to 106:7.

The Defendants note, correctly, that the record evidences Templeton had work-related problems describable as "issues with management" or "management issues" that were unrelated to her harassment complaint. ECF No. 66-1 at 19. For instance, after Templeton first resigned in 1993 and sought reemployment in 1997, Reichhart advised she not be rehired because of "issues on the operational side," including lack of attention to detail. Reichhart Dep. 37:1-2, 16-22. However, that Templeton is not guaranteed to succeed on her retaliation claims is immaterial; she has not moved for summary judgment. The Court finds only that there is a genuine dispute of material fact precluding judgment for the Defendants.

21; 17:2-6, 14-25.  Templeton bears the burden of showing that
these proffered reasons are "mere pretext for retaliation."
*Holland v. Wash. Homes, Inc.*, 487 F.3d 208, 218 (4th Cir. 2007)
(internal quotation marks omitted).

To demonstrate pretext, a plaintiff must either show that
a defendant's explanation is "unworthy of credence," or offer
"other forms of circumstantial evidence sufficiently probative
of [illegal] discrimination."  *Mereish v. Walker*, 359 F.3d 330,
336 (4th Cir. 2004) (internal quotation marks omitted).  "[I]t
is not the role of the court 'to decide whether the [legitimate,
nonretaliatory] reason was wise, fair, or even correct,
ultimately, so long as it truly was the reason.'"  *Hunter v.
Vilsack*, No. DKC-07-2655, 2010 WL 1257997, at *12 (D. Md. Mar.
26, 2010) (*quoting DeJarnette v. Corning Inc.*, 133 F.3d 293, 299
(4th Cir. 1998)).  "An employer's changing rationale for making
an adverse employment decision can be evidence of pretext."
*Thurman v. Yellow Freight Sys., Inc.*, 90 F.3d 1160, 1167 (6th
Cir. 1996) (*quoted in EEOC v. Sears Roebuck & Co.*, 243 F.3d 846,
853 (4th Cir. 2001)).

Here, there is sufficient evidence from which a factfinder
could conclude that the Defendants' proffered explanation is
unworthy of belief.  Reichhart testified that, when O'Donnell
first proposed the idea of rehiring Templeton, he opposed the
suggestion because of "some of the issues as far as loan files

were concerned." Reichhart Dep. 78:24 to 79:2. By contrast,
when O'Donnell contacted him a second time, Reichhart objected
to Templeton's lack of documentation about her production
levels[42] and his perception that they were inadequate. *See id.*
80:11-21; 81:6-9; 82:18-20. Reichhart could not recall what
level of production he was looking for, and did not have
firsthand knowledge of Templeton's production at the time. *Id.*
81:6-9; 82:9-13. When O'Donnell called Templeton, he told her
that Reichhart had refused to "sign off" on her rehiring because
"it wasn't a good time for [O'Donnell] to do this and the
qualifications weren't there." O'Donnell Dep. 65:11-15; *see id.*
75:7-25. Finally, in its answers to interrogatories, First
Tennessee stated that Templeton was not rehired because she had
failed to complete an online application. First Tenn. Answer to
Interrog. No. 4.

> Of course, if *no rational factfinder* could conclude
> that the [employer's job] action was discriminatory,
> then the case should not proceed beyond summary
> judgment. But, in the absence of evidence requiring
> such a conclusion, a prima facie case and evidence of
> pretext raises a sufficient inference of
> discrimination to entitle a plaintiff to survive a
> motion for summary judgment.

*Sears Roebuck & Co.*, 243 F.3d at 854 (emphasis added) (internal
quotation marks and citation omitted). Drawing all reasonable
inferences in Templeton's favor, the Defendants' shifting

---

[42] According to Templeton, O'Donnell never requested such
documentation. Templeton Dep. 109:7-16; Templeton Aff. ¶ 63.

explanations for not hiring her suffice to defeat summary judgment in their favor. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986).

b. The June 2009 Failure to Hire

The Defendants argue that Templeton's June 2009 allegations fail to establish a prima facie case of retaliation because there is "no evidence" of any adverse employment action taken during that period, or of a causal connection between such action and her protected activity. ECF No. 66-1 at 21, 23; ECF No. 96 at 6. Templeton contends that the Defendants' argument "misstate[s] the record." ECF No. 89-1 at 47. Templeton further notes that MetLife has "unreasonably failed to provide a complete answer" to her interrogatory requesting the identities of the MetLife employees who decided not to hire her or were consulted about the decision. *Id.* at 48. "Nor has MetLife explained who among the National City loan officers, which included Plaintiff, it did hire in 2008-2009." *Id.*

i. Adverse Employment Action

"An adverse employment action is a discriminatory act that 'adversely affect[s] the terms, conditions, or benefits of the plaintiff's employment.'" *Holland*, 487 F.3d at 219 (*quoting James v. Booz-Allen & Hamilton, Inc.*, 368 F.3d 371, 375 (4th Cir. 2004)). As stated above, failure to hire is adverse action. *Price*, 380 F.3d at 212. "An initial inquiry in any

32

failure-to-rehire case is whether the employer is under an obligation to consider the plaintiff for the position." *Wanger v. G.A. Gray Co.*, 872 F.2d 142, 146 (6th Cir. 1989). "Generally, if one formally applies for the position, then the employer is under an obligation to consider the individual if he is otherwise qualified." *Id.* However, there are "certain situations" when less than a formal application is adequate, such as when a person "makes h[er] desire for the position known to the employer." *Id.* at 146-47.[43]

It is undisputed that Templeton did not formally apply to work for MetLife; indeed, she did not personally discuss employment with anyone at the company in June 2009. Templeton Dep. 29:14-16. However, there is evidence that, in the preceding months, MetLife hired a majority of the 20 loan officers who worked in the same office as Templeton at National City. Templeton Dep. 32:18-22, 34:5-13; *see also* Taylor Dep. 42:13-15 ("Most of the good people had left and gone to MetLife, and it was me and maybe four or five others who were average

---

[43] *See also, e.g., Box v. A&P Tea Co.*, 772 F.2d 1372, 1377 (7th Cir. 1985) ("When an employer uses a . . . system in which employees do not apply . . . but rather are sought out by managers, the application requirement of the prima facie case is loosened somewhat."), *cert. denied*, 478 U.S. 1010 (1986); *Jackson v. Sebelius*, No. WDQ-08-1687, 2009 WL 3258585, at *4 (D. Md. Oct. 8, 2009) ("[W]hen the hiring process itself, rather than just the decision-making behind the process, is implicated in the discrimination claim or is otherwise suspect, the application requirement may be waived." (internal quotation marks omitted)).

loan officers."). According to Templeton, none of the officers who left National City for First Horizon had actively sought employment there. Templeton Dep. 30:2-4. MetLife was aware of Templeton's availability, as Taylor named her in discussions with the company. Taylor Dep. 42:16-20. Finally, there is some--disputed--evidence that "MetLife" had "refused" to hire Templeton. *Compare* Templeton Dep. 69:12-14, *with* Taylor Dep. 48:3-8.

Making all justifiable inferences in Templeton's favor, a reasonable factfinder could conclude that MetLife took adverse employment action against her by failing to hire her in June 2009.

ii. Causation

"Very little evidence of a causal connection is required to establish a prima facie case [of retaliation]." *Tinsley v. First Union Nat'l Bank*, 155 F.3d 435, 443 (4th Cir. 1998), *overruled on other grounds by Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101 (2002). "[B]y definition," a plaintiff alleging retaliation "must show . . . that the defendant was aware of her engaging in protected activity." *Constantine v. Rectors & Visitors of George Mason Univ.*, 411 F.3d 474, 501 (4th Cir. 2005).

The record reflects that Taylor formally met with MetLife leadership--including Reichhart--in late August or September

2008, to formally discuss the possibility of MetLife hiring National City employees. *See generally* Taylor Dep. 29:12 to 31:6. One month earlier, Reichhart had allegedly declined to rehire Templeton because she had "issues with management": a comment possibly directed toward her earlier complaints about Cameron's harassment and Reichhart's reaction thereto. Templeton Dep. 109:20 to 110:1; 110:20 to 111:17; 112:14 to 113:4 (*quoting* Compl. ¶ 19); *see also* Templeton Aff. ¶ 69. Taylor participated in further--albeit informal--employment discussions with MetLife between May and August 2009, including with O'Donnell. Taylor Dep. 31:7-21; 32:13. A reasonable fact-finder could conclude that MetLife knew of Templeton's earlier harassment complaint, and declined to hire her because of it.

Thus, the Defendants' motion for summary judgment will be denied.[44]

---

[44] Templeton has submitted, although the Court--having determined that summary judgment cannot be granted on her remaining claims --need not consider, additional grounds for denying summary judgment: a Rule 56(d) affidavit. *See* ECF No. 90-31. Contrary to the Defendants' assertion, ECF No. 96 at 3 n.1, that discovery has been completed does not render the affidavit untimely. *See, e.g.*, *Resolution Trust Corp. v. N. Bridge Assocs., Inc.*, 22 F.3d 1198, 1204 (1st Cir. 1994) ("There is no fixed time limit for filing a Rule 56[d] motion; that is, neither the Federal Rules nor the local rules place any relevant restriction on the submission of such a motion, at least when the court has not assigned a firm date for a hearing on, or adjudication of, the opposing party's summary judgment initiative").

III. Conclusion

For the reasons stated above, the Defendants' motion for summary judgment will be denied.

Date __7/24/13__

_____
William D. Quarles, Jr.
United States District Judge